UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **WILLIAM C HOUSTON**, | Case No. **07-61306-7** |
| Debtor. | |
| **WENDELL H ANDERSON** and **LINDA ANDERSON**, | |
| Plaintiffs. | |
| -vs- | Adv No. **08-00014** |
| **WILLIAM C HOUSTON**, | |
| Defendant. | |

## MEMORANDUM OF DECISION

At Butte in said District this 18th day of November, 2008.

In this adversary proceeding Plaintiffs Wendell H. Anderson ("Wendell") and Linda Anderson ("Linda") (together "Andersons") seek exception from the Defendant/Debtor William C. Houston's ("Houston") discharge of their claims totaling $475,524.00 from a state court civil judgment under 11 U.S.C. § 523(a)(6) for willful and malicious injuries by Houston to them. Houston opposes exception from his discharge on the grounds that Linda's $100,000 claim was

1

not the result of a willful and malicious act against Linda, and that Wendell failed to satisfy his burden of proof that his injury was willful and malicious under § 523(a)(6).  After trial of this cause and review of the parties' briefs and the record, this matter is ready for decision.  For the reasons set forth below, a separate Judgment shall be entered against Houston in Wendell's favor excepting his claim in the amount of $375,524.00 plus costs and accrued interest from Houston's discharge under § 523(a)(6), but dismissing and discharging Linda's derivative claim.

    An agreed Final Pretrial Order was submitted by the parties on September 5, 2008, (Docket No. 31) and approved on September 8, 2008.  The Pretrial Order provides that this Court has jurisdiction of this case under 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) to determine the dischargeability of particular debt.  This Memorandum of Decision includes the Court's findings of fact and conclusions of law under F.R.B.P. Rule 7052(a) (applying Fed. R. Civ. P. 52 in adversary proceedings).

    Trial of this adversary proceeding was held at Missoula on September 12, 2008. Plaintiffs were represented by attorney Jon R. Binney ("Binney") of Missoula, and Plaintiff Linda Anderson testified.  Houston appeared and testified, represented by attorney Harold V. Dye ("Dye") of Missoula.  Also testifying were Houston's spouse Robin Houston ("Robin"), Montana Brand Inspector Jody Hood ("Hood"), and Plaintiffs' friend Eugenia Steppe ("Eugenia"). Plaintiffs' Exhibits ("Ex.") 1, 2, 3, 4, 5, 6[1], 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, and Defendant's Ex. A. B, C, D, E, F, G, H, J, K, L, M, N[2], O, P, Q, and T were admitted into evidence.

    At the conclusion of the Plaintiffs' case-in-chief the Defendant moved for judgment as a

---

[1]Ex. 6 are Houston's bankruptcy schedules, of which the Court took judicial notice.

[2]Ex. N is the same as Ex. 8, and will be referred to herein as "Ex. 8".

2

matter of law to dismiss Linda's claim for damages under § 523(a)(6) because there was no evidence that Houston intended to injure Linda.  The Court took the motion under advisement and directed Defendant to put on his case-in-chief.

## FACTS

The Final Pretrial Order, at pages 2-3, sets forth the following "Agreed Facts":

a.  Plaintiffs filed a Complaint and Demand for Jury Trial in State District Court, Ravalli County, Cause No. DV-06-40 on July 18, 2006.

b.  After trial the jury entered a verdict in favor of Plaintiffs, Wendell and Linda Anderson and against William C. Houston.  The jury awarded damages to Wendell Anderson and Linda Anderson as set forth in the "Special Verdict Form" attached as Exhibit "B" to the complaint.

c.  On May 24, 2007, Judgment was entered against Defendant, William C. Houston in the amount of $475,524.00[3].

d.  No appeal of the Judgment was filed and the Judgment became final.

e.  Thereafter, Defendant, William Houston filed Bankruptcy on November 7, 2007.

f.  On February 4, 2008, Plaintiffs timely filed a Complaint seeking an exception to discharge on their Claim against William Houston based on a willful and malicious injury under 11 U.S.C. § 523(a)(6).

Additional facts are derived from the testimony and exhibits.

**The Parties.**

Plaintiffs Wendell and Linda Anderson are married and reside at 1697 Highway 93 North,

---

[3]Ex. 1 is the judgment, and states the amount as $476,524.00.

Victor, Montana, where they have resided for 28 years.  Linda raises horses and mules, and has

65 head of horses on her property.  Houston and his spouse Robin moved next door to Andersons

in November of 2000, and live at 131 Bear Creek Road.  Linda testified that they got along well

with their neighbors, including Andersons, until May of 2004.

**The Properties.**

Ex. 10 is an aerial view of Anderson's property on the lower right hand, southeast

portion**.**  Houston occupies the property adjacent to and north of Andersons' property on Ex. 10.

U.S. Highway 93 runs north-south to the east of the parties' properties.  Linda testified that

Houston's only access to his property was from the north.  Ex. O is a "Google Earth" satellite

photograph of the parties' properties with Andersons' property on the left side above the

highway, and a large building Houston called the "Houston Space Center" shown just off-center

on Houston's property[4].  Houston used the Houston Space Center for his auction/consignment

business in 2004.  He testified that the Houston Space Center is a little more than 200 feet from

the fence separating his property from Andersons' property.

Houston testified that the area is way too wet, and the ditches are for draining water off.

A pond[5] exists on the west side of Andersons' property 30 feet from the fence, from which water

flows northeast across the property line and then through ditches on Houston's property, and then

under Highway 93.  Ex. 10 shows a "Real Irrigation Ditch" handwritten in near the Houston

---

[4]The Houston Space Center is shown on Ex. 16 on the upper left hand corner, a building with a blue roof, and in the middle of Ex. 10.  Linda testified that a small portion of Houston's residence is visible on Ex. 16 east of the Space Center.

[5]Linda testified that spring water flows across the back of both properties and into her pond.

4

Space Center, and a "Little Irrigation Ditch" handwritten in south of the "Real Irrigation Ditch" that is closer to Andersons' property.

Linda testified that she took the photograph Ex. 16[6] to show Houston on his tractor filling in the "Real Irrigation Ditch" in March of 2004, as seen from Anderson's kitchen window[7]. Robin and Houston testified that the local sanitation department asked them to fill in the "Real Irrigation Ditch" because of its proximity to a septic system they installed in the Houston Space Center, and they complied. Linda testified that Houston did not dig another ditch for the water to drain after he filled in the ditch at Ex. 16[8]. As a result of Houston filling up the "Real Irrigation Ditch", Linda testified, water backed up and flooded Houston's property in May of 2004[9].

The parties dispute whether a ditch existed next to the fence line separating their properties, on Houston's side, on May 28, 2004. Robin testified that the ditch along the fence was there for a long time, and that a "little bit[10]" of it is shown by Ex. G. Houston testified that the ditch between the properties is shown by Ex. C and was there before May 28, 2004, but he does not know for how long. He testified that he has never filled in that ditch. On rebuttal Linda testified that no ditch existed along the fence line on May 28, 2004, when Wendell was injured.

_____

[6]Linda testified that she took Ex. 16 and 17 in the Spring of 2004.

[7]Ex. 16, 17, L, and K all were taken from Anderson's kitchen/dining room window.

[8]Linda explained that everyone who had lived on Houston's property before worked with the neighbors regarding the irrigation, and that Houston was supposed to dig a replacement ditch when he filled one in.

[9]Ex. G is the clearest evidence in the record showing the flooding on Houston's property looking south at Andersons'.

[10]Looking at Ex. G, the Court finds that it clearly shows the existence of water all over Houston's field, but finds no evidence of a ditch next to the fence visible on Ex. G.

A 250 foot long fence divides Andersons' property from Houstons'. Part of the fence is wood and in disrepair[11], Ex. 13, but the part of the fence involved in the incident is made of two and three-eighths inch drill stem pipe, a pipe top rail, and four woven-wire strands between the posts which Houston testified are 10 feet apart. Ex. A. Other sections of the fence are wooden with barbed wire. Linda testified that the fence post shown in Ex. A was in a two inch deep concrete footing. Houston testified that the fence post footings are two and one-half feet deep with cement for 2 feet.

The photographic evidence shows that Andersons' property along the fence line contains numerous items of personal property, including vehicles, a horse trailer, implements appliances tanks, tires, a large pile of logs and a haystack next to the fence. See Ex. 14, 15, 16, 17, A, B, D, E, F, and G[12]. Linda testified that the woodpile shown by Ex. A was right on the fence line, and that Andersons had cut the wood for a common stack.

**Before Wendell's Injury.**

Linda testified that, before May 28, 2004, any problems they had with Houston were "minor." At trial Houston agreed, and he testified that he still thinks his problems with Andersons were minor.

Eugenia testified that Houston had asked Andersons to let him build a driveway across their property and they said no, and that Houston was upset about that. Houston admitted that he had spoken with Andersons about a joint driveway onto Highway 93, and that Andersons at first

---

[11]Ex. 13 shows part of the wooden fence is down, which allowed Andersons' mules to cross over onto Houston's property.

[12]Ex. A, B, E, F, and G were taken from Houston's property and show Andersons' personal property along the fence on their side.

6

agreed but later said no, but he answered "No" when asked if that upset him.

Houston testified that the problems with Andersons involved water and livestock trespass. Linda testified that Houston was keeping all the irrigation water for himself, depriving Andersons and other neighbors of water to irrigate with, and that livestock moved back and forth across the property line. Linda testified that Houston ripped out some wooden fence posts, leaving the fence on the ground.        Houston testified that 2 mules and 4 horses belonging to Andersons were coming onto his property for several weeks prior to May 28, 2004, in search of food. He testified that he talked to Andersons about the mules but it didn't seem to do any good because the 2 mules kept crossing over. Houston put the 2 mules in his corral. Linda testified that Houston refused Andersons' request to return them. Houston testified that he did not refuse to give the mules back, but that he did not offer to give them back. He denied that he was told by a brand inspector to give the mules back. When asked whether he intended to keep the mules, Houston testified that he was trying to follow brand inspection law in place at the time[13].

Linda testified that they filed a civil suit against Houston to recover her 2 mules when he refused to return them. Linda testified that the summons and complaint were served on Houston at about 4 p.m. on May 28, 2004, an hour before he assaulted Wendell. Houston testified that his spouse Robin was served with the summons and complaint before 5 p.m. on May 28, 2004. Ex. 7 is the process server's certificate of service of the summons and complaint[14] on Kelly[15]

---

[13]Houston did not specify, in his testimony or brief, what Montana law requires for one to refuse a neighbor's request to return livestock.

[14]Ex. M is the summons and complaint.

[15]Kelly appears to be another name for Robin Houston, but Robin testified she does not recall being served or signing for the summons and complaint, although she knew that Bill

Houston at 4:52 p.m.  Houston recalled being served with the summons and complaint, but he denied that being served upset him, and both he and Robin testified that it came as no surprise as they knew it was coming[16].  He testified that it was not a major problem and you can't blame animals for crossing property lines.  Houston testified that he got on his tractor, a John Deere 2240 with a 2 foot bucket[17] which he stated weighs 6,000 pounds and which appears in Ex. 16 and 17, about 15 or 20 minutes after being served with the summons and complaint.

Linda testified that the water against the fence shown by Ex. A was present on May 28, 2004, and the whole field was flooding after Houston dropped his tractor bucket and made the water flow down the fence line.  Houston testified that his property was wet and muddy on May 28, 2004, as shown by Ex. G.  He testified that he had a load of equipment arriving for consignment sale, and that on May 28, 2004, he was moving dirt from the Houston Space Center foundation to along his house, and was trying to dry his field on the other side of his property by cleaning out the ditch along the fence next to Andersons' property.

**May 28, 2004 – Wendell's Injury.**

Linda testified that Houston assaulted Wendell with his tractor and bucket attachment on May 28, 2004.  Ex. J is a photograph of Houston's tractor bucket, which he testified has not been changed since May 28, 2004.  He testified that it is a 2 foot bucket with "quite a slope."[18]

_____

received something.

[16]Houston testified that the civil complaint to recover the mules was settled, and that Andersons paid him $100 in restitution.

[18]The angle of the side of the bucket while laying flat as shown on Ex. J is almost 45 degrees.

Linda testified that Eugenia and her spouse Jim Steppe[19] (now deceased) were visiting Andersons' home and they all were at the dining room/kitchen window.  Ex. K, L.  Linda testified that she saw Wendell from her kitchen window down by the fence and the pile of logs.  Ex. K, L.  She testified that Wendell was about 3 feet from the fence trying to divert water along the fence line away from his haystack, which was close by the fence and east of the log pile.  Ex. A, B, E, F.

Ex. 15 is a photograph of Wendell taken by Linda several weeks after Wendell's injury in August 2004, showing him standing next to the bent fencepost, and next to a much-diminished log pile.  Linda testified that Ex. 15 shows Wendell's approximate location when he was injured and she testified that the distance from her window to the fence at that point as approximately ninety feet.

Because of the conflicting testimony, the witnesses' testimony regarding Wendell's injury will be set forth separately.

### Linda's & Wendell's Testimony.

Linda testified that she was standing at the window when she heard Jim Steppe yell and she looked out the window.  She testified that when she first saw Houston he was halfway from the Houston Space Center to the fence, and heading in a southeasterly direction on his tractor.[20]  Linda testified that Houston drove the tractor straight at Wendell at about 12 miles per hour.[21]

---

[19]Eugenia testified that Jim Steppe died in January 2008.

[20]Linda testified that the horse trailer visible on the left side of Ex. 16 was not there on the date of Wendell's injury.

[21]In Wendell's deposition he testified that he watched Houston drive around and around on the tractor for a few minutes, then came directly at the fence on the tractor "at a pretty good

She testified that Houston was looking right at Wendell and "I saw pure rage on Mr. Houston's face."[22]  Linda testified that she and Eugenia Steppe both yelled to "call the cops" at about the same time.  Linda could not recall who spoke first.  On re-cross examination Linda was asked whether she could have yelled to Wendell a warning, but she answered that Wendell is hard of hearing and would not have heard.

Linda testified that the bucket on Houston's tractor was raised.  Wendell testified that the bucket was raised about three feet off the ground, above his legs.  Ex. Q, p. 10.  Linda testified that she saw Houston run into the fence with the tractor bucket and knock Wendell to the ground.  Later she testified that she did not see whether it was the fence or the tractor that hit Wendell, but she saw Wendell fall[23].

In his deposition Wendell testified that Houston hit the fence, and: "I don't know if he was trying to hurt me or he just hit the fence, but he knocked me down".  Ex. Q, pp. 6, 11.  Wendell testified that he hit the ground "hard."  Ex. Q, p. 12.  Linda testified that, after he hit the fence, at first Houston watched Wendell laying on the ground.

Linda testified that she dialed 911 right after Houston hit the fence post, probably less than 10 seconds, and that she said that she thought Wendell was dead**.**  Houston's Ex. T is the 911 transcript of Linda's call on May 28, 2004.  Ex. T does not include Linda's statement that she thought Wendell was dead, but Linda told the 911 dispatcher that Houston "just came with a tractor, as fast as he could, and hit the fence" trying to run into Wendell.  She told the 911

_____

speed and knocked me down."  Ex. Q, pp. 7-9.

[22]Linda testified at trial that she still can see the look on Houston's face.

[23]Wendell testified that he stepped back but didn't go far enough.  Ex. Q, p. 8

operator that Houston "rammed the fence right into my husband's head", but that Wendell got up and came into the house, and Houston rode off with the tractor.  Ex. T.

Linda testified that Wendell was struck on the right side of his face, and his left side hit the ground.  Ex. 11 shows bruising above and below Wendell's right eye the morning after the assault, and Ex. 12 shows bruising on the left side of Wendell's face.  On Linda's 911 call she stated:  "Oh god, its red as can be Wendell."  Ex. T.  Linda told the 911 dispatcher that Wendell did not need an ambulance, but she asked for a sheriff officer to come out.  Ex. T.

Ex. A, B, and H show the fence post which Houston struck, with an indentation in the post just below the second strand of wire up from the ground.  The post ring holding the second wire does not appear damaged in Ex. A, B, and H, but at least two wire strands were broken.  Ex. H.  Linda testified that the concrete footing of the post which Houston struck was knocked out by the impact, but was stuck back into the ground by the time the photograph in Ex. A was taken on May 29, 2008.

### Eugenia's Testimony.

Eugenia testified that she was sitting at the Andersons' kitchen table between her husband and Linda drinking coffee when she witnessed the incident.  Eugenia's testimony about the incident was materially the same as Linda's.

She testified that she first saw Houston about halfway from the Houston Space Center to the fence heading straight at Wendell, who was trying to divert water from going under the hay bales.  Eugenia testified that she yelled at Linda to call somebody because there was going to be trouble.  Under cross examination Eugenia could not say whether she turned to Linda when she yelled.  She testified:  "I was watching all the time because I knew the tractor was not going to be

able to stop in the mud."

Eugenia testified that Ex. K shows the scene out the window, except that the horse trailer in Ex. K was not there at the time. Eugenia testified that the tractor was red[24] and had a bucket raised between 3 to 4 feet high, and that the tractor was going as fast as possible and did not slow down before it hit the fence post. She testified that the field was in a wet and muddy condition and she knew that Houston would not be able to stop in time. But, she believes that Houston intended to injure Wendell from the expression she saw on Houston's face.

Eugenia testified that after he hit the fence post Houston looked at Wendell, and Eugenia testified that from the expression on Houston's face she thought he would get off the tractor and beat Wendell. Then she testified she saw Houston drive away and pick up his wife, then returned. Eugenia saw Wendell's bruises, and testified that she did not think he would get up.

Defendant's counsel impeached Eugenia with her deposition testimony that Andersons' friends identified as Bev and Kim were present during the incident. Eugenia testified at trial that she was pretty upset by Wendell's injury and that Bev and Kim arrived right after the incident. Eugenia also testified at her deposition that she was the first to speak, but at trial she testified that she and her husband kind of yelled at the same time, and that it happened very fast.

**Houston's Testimony.**

Houston testified that he "bumped" the fencepost about 20 minutes after being served with the summons and complaint. He denied that Wendell was within 3 feet of the fence when he bumped the post, and testified that "in no way, shape or form" did he intend to harm Wendell.

---

[24]Of course, Houston's John Deere tractor is that company's signature green color, as shown in Ex. 16 and 17. However, Ex. 16 and 17 also show Andersons' tractor, which is red, in the foreground, which could explain Eugenia's confusion about the color.

Houston denied that he drove his tractor straight at the fence.  He testified that Ex. C and D, which are both date stamped "04 5 29", show how his tire tracks running along and into the ditch on May 28, 2004.  Houston testified that he came along the fence on his tractor moving roughly parallel to the ditch at about a fifteen degree angle, about 4 or 5 miles per hour, with the bucket about 6 feet off the ground, when his right front tire fell in the ditch and bumped the fence post which was next to a big pile of timber.  Houston testified that he then noticed Wendell, but that he did not see anyone in Andersons' house.

Houston denied that the footing of the fence post which he hit came out of the ground. He testified that he viewed the damage to the fence post, but did not believe it resulted from a high speed collision because his tractor weighs 6,000 lbs.  Houston testified that Ex. A shows how the damaged post looked on May 28, 2004, and the pile of timber shown on Ex. A and B were as they were on May 28.

**After Wendell's Injury.**

On direct examination by Plaintiffs' counsel Houston was asked what he did after he hit the fence post and answered:  "I just drove off."  On cross examination by Plaintiffs' counsel Houston later admitted that he told Wendell to stay on his side of the fence, a statement he also told the investigating officer in Ex. 8, discussed below.

Linda testified that Houston drove away from Wendell on the tractor, picked up his wife and rode around with her on the tractor[25].  Robin testified that she was in the house when

---

[25]Linda testified that Robin Houston "is as guilty as he is in my book."  However, Robin was not charged with any crime or violation and Andersons did not seek judgment against Robin in the state court civil action or in this adversary proceeding.

13

Wendell came in, and he told her he hit the fence[26].  She testified that they were in their house when the sheriff arrived, and then they got on their tractor, took one loop around together and then Robin got off and did chores.

Wendell went back to his house after he got knocked down.  Ex. Q, p. 11.  Linda testified that the sheriff arrived about 5 minutes after she called 911 and talked to her, and that their friends Kim and Bev showed up at the same time as the sheriff.  Houston testified that the sheriff arrived about an hour after he hit the fencepost and he gave a statement.

**Ex. 8 – Sheriff's Incident Report.**

The sheriff's incident report is Ex. 8, dated 5/28/04, written by investigating officer Barron Allestad ("Allestad").  Ex. 8 describes the incident as "Assault with Weapon", estimates the time the incident occurred between 6:20 p.m. and 6:23 p.m., and stated the times the incident was discovered and Allestad took the report as 6:26 p.m.

Ex. 8 states that Wendell told Allestad that he was standing by the fence between the pile of logs and the haystack trying to divert water when Houston rammed the fence with his tractor, causing the fence rail to strike Wendell in the forehead and knocking him to the ground, then "drove off without saying a word."  Under direct and cross examination by Plaintiffs' counsel, Houston testified that he told Wendell to stay on his side of the fence to eliminate "trouble."

Ex. 8 includes Linda's statement which mostly corroborates Wendell's statement, and stating that Houston drove the tractor at a good rate of speed with the bucket about 4 feet in the air and that Wendell was knocked down.  Ex. 8 includes Eugenia and Jim Steppes' statements corroborating Wendell and Linda, such as that Wendell was struck in the forehead by the top

---

[26]Robin did not witness the tractor hit the fence.

14

fence rail.  Allestad suggested that Wendell go the hospital, and Ex. 8 states that friends took Wendell to the hospital at 7:20 p.m.

Ex. 8 states that when Allestad arrived at the scene on May 28, 2004, Houston and his wife were riding on their tractor in their field.  He interviewed Houston beginning at 7:48 p.m. Ex. 8 states that Allestad told Houston what the Andersons and Steppes had reported and Houston "stated that it was bullshit" and "a God damn lie."  Houston told Allestad that he was cleaning the ditch with the tractor when he hit the fence.  He stated that he tried to hit the brakes but they were in poor condition and did not stop the tractor, his front right tire went into the ditch, "causing the bucket on the tractor to dip down."  Ex. 8, p. 4.  Houston admitted that the force of the bucket hitting the post caused the post to bend, but denied that the fence rail hit Wendell and state that Wendell never fell.

Page 4 of Ex. 8 states that Houston told the investigating officer:   "[After he hit the fence he told Wendell to stay on his own property of there was going to be trouble" and that after he spoke to Wendell he drove off.  Under cross examination by Plaintiffs' counsel Houston was asked what he meant by "trouble" and Houston answered that any time water comes under hay there is a problem[27].

Ex. 8 concludes with Houston's statement that it was an accident when he hit the fence, and that pictures were taken of the fence and tracks from Houston's property and filed with the

---

[27]In other words, after being served with legal process, and after striking the fence with his tractor, Houston was demonstrating to Wendell what other "trouble" Houston could cause by forcing water under Andersons' hay bales.

report.[28]

**Photographic Evidence.**

Wendell testified at his deposition that Houston tried to straighten up the bent fence post. Ex. Q, p. 11.  Linda testified that she observed Houston on his tractor after the assault on May 29, 2004, that Houston was covering up his tracks near the site of the assault, and that when Houston saw her he left.  Linda testified that the tracks left by Houston were consistent with back dragging, but Houston denied doing any back dragging on his property on May 29, 2004, and he denied putting in the tracks shown on Ex. C and D on May 29, 2004, or otherwise altering the scene.

Robin testified that both she and the sheriff took photographs of the scene.  On rebuttal Houston testified that the sheriff took the pictures marked Ex. C and D on May 29, 2004.  Linda also took several photographs which were admitted.  Houston testified that his attorney Dye took the closeup photograph of the damaged fencepost, Ex. H[29], and that nothing about that post has changed from May 28, 2004, to the date of trial.  Ex. H shows the impact crease just below the second strand of woven wire, and 2 loose strands.  Linda testified that the indentation on Ex. H is not consistent with Houston's story that he came parallel to the fence and the side of the bucket struck the fence.  Linda testified that the indentation would tip down, not up as shown on Ex. H, if the incident had happened according to Houston.  On rebuttal, Houston disagreed and testified that the indentation shown on Ex. H was caused by his slipping into the ditch and bumping off

---

[28]It is not clear from the record which of the sheriff's photographs of the fence and tracks were admitted into evidence.  Linda testified on cross examination during rebuttal that she does not dispute that Ex. C and D were taken by the sheriff's department.

[29]Dye stated that he also took Ex. I.

the post.

Robin testified that Ex. A shows what the post which Houston hit looked like on May 28, 2004.  Ex. A has a date stamp on the upper right hand corner stating "04 5 29".  Linda testified that Ex. A was taken on May 29, 2004, and that it shows what the fencepost looked like on May 28, 2004, but that other details had changed from the day before.  Ex. E is dated May 29, 2004, and shows the bent post and the pile of logs.

Ex. B is another photograph of the fence post showing a crease at the point of impact below the second wire, dated "'04 5 29".  Ex. B shows that the crease where the blade impacted the post is tilted slightly up from left (east) to right (west).  Significantly, none of the photographs showing the damaged post, i.e., Ex. A, B, H, E, and F, show any damage to the post ring which holds the wire directly above the crease caused by the impact.  As discussed below, in particular the condition of the ring and crease shown by Ex. A, B and H show that the incident could not have happened as described by Houston.

Ex. C is dated "04  5 29."  Robin testified that she did not take Ex. C, but that it shows the damaged post and the ditch, and tractor tire tracks as they were on May 28, 2004.  Linda disputed this on rebuttal, testifying that the tire tracks on Ex. C were not present when Wendell was injured on May 28, 2004, but that she saw the tire tracks and conditions shown by Ex. C on the next day, May 29, 2004.  Ex. C shows the ditch on Houston's property with fresh dirt along the edge, and Houston's muddy field with several tire tracks including the most prominent set approaching at a narrow angle from the northwest toward the southeast until the right front tire track disappears into the ditch near the damaged post.  There are other furrows shown by Ex. C which look like tire tracks running at right angles to the fence, and fresh dirt dropped along the

17

ditch bank.

Ex. D, dated "04 5 29" is a slightly different angle as Ex. C, showing the tire track running into the ditch and the bent post.  Linda testified on rebuttal that the tire tracks shown on Ex. D were made on May 29, 2004.

Ex. 14 was taken by Linda, who dated it May 29, 2004.  Ex. 14 shows the churned up muddy field on Houston's property looking east along the fence, and several furrows running at right angles into the ditch which may be tracks, but does not show the tracks running into the ditch shown by Ex. C and D[30].

Ex. F is date stamped "04 5 29", and while Ex. F shows tire tracks, the damaged fence post, and churned up mud on the north side of the ditch in a portion of the field, Ex. F does not show the churned up field further east which is shown by Ex. 14, which means that the tractor work shown by Ex. 14 took place after Ex. F was taken, but still on May 29, 2004.  Houston testified that Ex. E and F show the damaged post and logs as of May 28, 2004, and that Ex. F shows in addition his tire tracks on May 28.

Ex. G, which Robin testified she took on May 28, 2004, shows Houston's field looking south about 100 to 150 feet toward Andersons' haystack and log pile where the incident took place.  Ex. G shows Houston's field largely inundated with water, but Houston testified that Ex. G shows water leaving the field on May 28, 2008.  Robin first testified that she took Ex. G after the incident between 6:00 and 6:30 p.m. on May 28, 2004, after she and Houston gave their

---

[30]The white panel on the right side of Ex. 14 also appears at the top left hand corner of Ex. A along the fence, located more than 2 fence posts east of the damaged post, so it would not show the tracks on Ex. C and D, which look west along the fence.

statement to the sheriff,[31] but she later testified that she must have taken Ex. G after 8 p.m.  Ex. G does not show any of the tracks or churned up mud in the field shown by Ex. C, D, F, and 14, taken the following day.  Nor is there any plainly visible damage to the fence post on Ex. G.

**Other Evidence.**

Jody Hood is a brand inspector for the Montana Department of Livestock.  Hood testified that she has done brand inspections for Houston, and performed one inspection on June 11, 2004, when Houston called him and asked her to come to his place and inspect some livestock.  She testified that after the inspection Houston discussed with her the incident involving Wendell.  Hood testified that she wrote a note on June 15, 2004, memorializing her discussions with Houston on June 11, 2004, which was admitted without objection as Ex. 4.  Under cross examination Hood testified that she was asked by Linda or her attorney to prepare Ex. 4 because of Houston's statement that he tried to kill Wendell.

Ex. 4 states that Houston asked Hood whether she know about what was going on, and Hood told Houston that she was not getting in the middle of anything, that Andersons were Hood's friends for a long time, and that all Houston had to do was put in a new fence.  Hood admitted under cross examination that she had learned that Houston had hit the fence and Wendell was hurt.  Ex. 4 states that Houston replied by complaining about problems with fencing and the cost of pipe, then quotes Houston as saying:  "[I]t will all work out – it will be okay.  I thought it would all work out till I tried to kill him."

Houston admitted discussing the incident with the brand inspector, but testified:  "That is

---

[31]In Ex. 8 the investigating officer wrote that he arrived at Houston's residence and met with Houston at approximately 7:48 p.m.

totally incorrect" when asked if he told Hood that he tried to kill Wendell.  Hood testified that Ex. 4 sets forth exactly what Houston told her, that she thought he was serious because of "the look he had in his eye" and that she thinks Houston intended to hurt Wendell.  Hood testified that she knows Andersons and had been to their place as neighbors and friends, but that their friendship did not affect her testimony.  Hood testified that she did not tell the sheriff about Houston's statement that he tried to kill Wendell.

A criminal complaint was filed against Houston on August 4, 2004, in Ravalli County, Montana, Justice Court, Cause No. CR-2004-319, accusing Houston of assault with a weapon and criminal endangerment, two felonies.  Ex. 9.  Charge I of the criminal complaint accuses Houston of "purposely or knowingly causing bodily injury to Wendell Anderson by running a tractor with attached bucket toward Wendell Anderson, hitting a fence, and causing a fence top rail to give way and hit Anderson in the forehead, causing an injury."  Ex. 9.  Charge II accuses Houston of knowingly engaging in conduct that created a substantial risk of death or serious bodily injury to Wendell by "driving a tractor at excessive speed toward Wendell" hitting the fence top rail, hitting Wendell in the forehead and knocking him to the ground.

Linda testified that Houston entered into a plea bargain in his criminal case and pleaded guilty.  Houston testified that he entered into a plea agreement and pleaded nolo contendere, and a criminal judgment was entered against him.  Houston explained that he pleaded nolo contendere in return for the assault charge being dropped.  He testified that by pleading nolo contendere he was able to resolve the criminal charges for $3,000, versus $7,500 if he went to trial, and he could not afford to pay for a trial.  Houston was ordered to pay restitution and serve probation.  He paid the restitution right away, and testified that he successfully completed his

probation 3 years ago and was allowed to withdraw his plea, and the charges were dismissed.

Andersons sued Houston in state court. Linda testified that they received funds paid for Wendell's medical bills up to the time of trial. Houston testified that a big jury verdict was entered against him, and feels he was not adequately represented. Ex. 1 is the judgment entered against Houston in the Montana Twenty-First Judicial District Court, Ravalli County, Cause No. DV-06-40, in the total amount of $476,524.00 on May 31, 2007.

Ex. 2 is the special jury verdict form. The jury answered "yes" to questions whether Houston committed negligence, and an assault or battery on Wendell which caused Wendell injury or damages. Ex. 3 is jury instruction No. 17 and states:

> An assault is any intentional threat of harmful or offensive contact with another by force under circumstances which create a well founded fear of such contact, coupled with the apparent present ability to carry out the threat.
>
> A battery is an intentional contact by one person with the person of another which is harmful or offensive.

Ex. 2 shows that Wendell was awarded a total of $376,534[32], and Linda was awarded a total of $100,000 for loss or impairment of marriage and emotional distress suffered by Linda. The jury answered "no" to whether Houston should be required to pay punitive damages.

Houston filed his Chapter 7 petition on November 7, 2007. At Schedule F Houston listed the Andersons with an undisputed claim from the tort judgment in the amount of $476,524. Andersons filed their proof of claim, then filed an amended claim No. 2 on June 5, 2008, in the

---

[32]There is a $10 discrepancy between the total damages awarded on Ex. 2 and the judgment on Ex. 1.

amount of $497,412.72[33].  No objection has been filed.

Linda testified that Wendell's memory is now gone, and that "he doesn't know me."[34]
She testified that in addition to his head injuries Wendell suffered two fractured vertebrate, and
that he is still undergoing treatment.  She testified that Wendell testified at the civil trial against
Houston, but was not able to testify at the trial of this adversary proceeding[35].

## DISCUSSION

It is neither this Court's task nor intention to unravel all of the disputes between the
parties in this adversary proceeding, nor to reconcile all of the disputed evidence.  Plaintiffs seek
exception of the entire amount of their claims awarded in the state court judgment from
Houston's discharge under § 523(a)(6).  Houston responds that Plaintiffs failed to satisfy their
burden of proof under § 523(a)(6) to show subjective intent by Houston to injure Wendell, and
that there was no intent to injure Linda.

The principal purpose of the Bankruptcy Code is to grant a "fresh start" to the "honest but
unfortunate debtor."  *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 127 S.Ct. 1105, 1107,
166 L.Ed.2d 956 (2007).  The "fresh start" is explained by the Ninth Circuit Bankruptcy
Appellate Panel in *Albarran v. New Forms, Inc. (In re Albarran)*, 347 B.R. 369, 379 (9th Cir.
BAP 2006):

> The general policy of bankruptcy law favors allowing an honest debtor to
> discharge debts and to make a fresh start free from the burden of past

---

[33]The amended Claim No. 2 lists a secured portion in the amount of $210,000.00 and an
unsecured portion in the amount of $287,412.72.

[34]At his deposition Wendell testified:  "My memory's been hurt."  Ex. Q, p. 5.

[35]Ex. Q is the transcript of Wendell's deposition.

indebtedness. *See Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970). Thus, because a debtor in bankruptcy is assumed to be poor but honest, there is a presumption that all debts are dischargeable unless a party who contends otherwise proves, with competent evidence, an exception to discharge. *See Brown v. Felsen*, 442 U.S. 127, 128-29, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); Hon. Barry Russell, BANKRUPTCY EVIDENCE MANUAL ¶ 301.60, p. 870 (2006 ed.).

The corollary to this policy is that only the "honest but unfortunate" debtor is entitled to an entirely unencumbered fresh start. *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

*Grogan*, in further explaining the "fresh start" policy of the Bankruptcy Code, states that "a central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.' *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)." *Grogan*, 498 U.S. at 286, 111 S.Ct. at 659.

In a nondischargeability claim the burden of proof falls on the creditor to prove the elements by a preponderance of the evidence. *Grogan*, 498 U.S. at 291, 111 S.Ct. at 661 ("we hold that the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard."); *Branam v. Crowder (In re Branam)*, 226 B.R. 45, 52 (9th Cir. BAP 1998), *aff'd*, 205 F.3d 1350 (9th Cir. 1999). When applying the preponderance of the evidence standard, "[i]n addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury producing action." *Albarran*, 347 B.R. at 379, quoting *Carrilo v. Su (In re Su)*, 290 F.3d 1140, 1146 n.6 (9th Cir. 2002). However, in order to give effect to the fresh start, exceptions to discharge are strictly construed against an objecting

creditor and in favor of the debtor. *Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992); *Klapp v. Landsman (In re Klapp)*, 706 F.2d 998, 999 (9th Cir. 1983).

   **I. § 523(a)(6).**

   Section 523(a)(6) excepts from discharge any debt "(6) for willful and malicious injury by the debtor to another entity or to the property of another entity." *Barboza v. New Form Inc. (In re Barboza)*, __ F.3d __, 2008 WL 4307451, * 3; *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202,1205 (9th Cir. 2001), *cert. denied*, 533 U.S. 930, 121 S.Ct. 2552, 150 L.Ed.2d 718 (2001). As far as injury, the Court finds and concludes that the Plaintiffs satisfied their burden of proof that they both were injured. Ex. 11 and 12, 8, the civil jury verdict Ex. 2, Q, and the testimony of Linda and Eugenia, establish beyond a preponderance of the evidence that Wendell was injured by Houston when he struck the fence post with the tractor bucket. Despite Houston's denial, the Court finds that Wendell was knocked down when Houston struck the post. The evidence of Wendell's head injuries and memory loss caused by the incident is uncontroverted, and plentiful. The testimony of Linda, Eugenia, and Ex. 2 and Q, establish by a preponderance of the evidence that Linda suffered injuries caused by Houston in the form emotional distress and interference with her marital relations when Houston struck the post and injured Wendell. However, that does not end the enquiry under § 523(a)(6).

   **II. Claim Preclusion(Res Judicata)/Issue Preclusion(Collateral Estoppel) Effect of Judgments**.

   Plaintiffs argue that the state civil jury verdict and judgment have collateral estoppel effect establishing that Houston assaulted and/or battered Wendell under state law. Houston argues that both willful and malicious are separate elements of a § 523(a)(6) claim and both must

be found for an exception to discharge, citing *Barboza.*

A creditor is not precluded from establishing the nondischargeability of a state court judgment that is not predicated on findings or a cause of action establishing nondischargeability. *Nahman v. Jacks (In re Jacks)*, 266 B.R. 728, 736 (9th Cir. BAP 2001). Houston pleaded nolo contendere to the criminal complaint, and Plaintiffs won a jury verdict and judgment in state civil court. Ex. 1 & 2.

With respect to Houston's plea of nolo contendere, the Ninth Circuit in *Tseung Chu v. Cornell*, 247 F.2d 929, 938 (9th Cir. 1957) wrote:

> The plea of nolo contendere when accepted by the court it becomes for all practical purposes, "the full equivalent of a plea of guilty," *Farrington v. King*, 8 Cir., 128 F.2d 785, 786, but distinguishable from that plea "in that it cannot be used against the defendant as an admission *in any civil suit for the same act."* (Emphasis added.) *Tucker v. United States*, 7 Cir., 1912, 196 F. 260, 262.

*See also* 21 AM. JUR.2d, *Criminal Law*, § 685 (2nd ed. 2008) (Court in any subsequent civil proceeding must independently examine the facts in order to determine whether the defendant actually committed the offense alleged for the purposes of that particular civil proceeding).

The Montana Supreme Court has held that a nolo contendere plea carries no collateral estoppel effect in civil proceedings because the plea does not constitute a judgment on the merits. *In re Estates of Swanson*, 2008 MT 224, ¶¶ 16, 17, 18, 344 Mont. 266, ¶¶ 16, 17, 18, 187 P.3d 631, ¶¶ 16, 17, 18.

The test in Montana for collateral estoppel is stated in *Swanson*, ¶ 16:

> (1) the issue decided in the prior adjudication is identical with the one presented in the action in question;
> (2) there was a final judgment on the merits; and
> (3) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication;.

25

*See also Safeco Inc. Co. of America v. Liss*, 2000 MT 380, ¶¶ 45, 46, 48, 51, 303 Mont. 519, ¶¶ 45, 46, 48, 51, 16 P.3d 299, ¶¶ 45, 46, 48, 51.

Despite Montana law that a nolo contendere plea as a matter of law fails the collateral estoppel test, *Swanson*, ¶¶ 16, 17, 18, on the other hand, and notwithstanding *Tseung Chu*, while Houston's nolo contendere plea may not be given collateral estoppel effect, the Montana Supreme Court has agreed that a plea of guilty, while it does not serve the policy underlying collateral estoppel to make such a plea conclusive, is admissible in a subsequent civil action on the independent ground that it is an admission. *Safeco Inc. Co. of America v. Liss*, ¶ 49, quoting *Teitelbaum Furs, Inc. v. Dominion Ins. Co.* (1962), 58 Cal.2d 601, 25 Cal.Rptr. 559, 375 P.2d 439, 441, *cert. denied,* 372 U.S. 966, 83 S.Ct. 1091, 10 L.Ed.2d 130 (1963).

Turning to the civil judgment, Ex. 1, as explained by the BAP in *Baldwin v. Kilpatrick (In re Baldwin)*, 245 B.R. 131, 134 (9th Cir. 2000), *aff'd,* 249 F.3d 912 (9th Cir. 2001):

> The doctrine of collateral estoppel, or issue preclusion, is intended to protect parties from multiple lawsuits and the possibility of inconsistent decisions, and to preserve judicial resources. *See Kelly v. Okoye (In re Kelly)*, 182 B.R. 255, 258 (9th Cir. BAP 1995), *aff'd,* 100 F.3d 110 (9th Cir.1996). Collateral estoppel applies in dischargeability proceedings. *See Grogan v. Garner*, 498 U.S. 279, 284-85, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The burden of proof is on the party seeking to assert collateral estoppel and in order to sustain this burden, "a party must introduce a record sufficient to reveal the controlling facts and pinpoint the exact issues litigated in the prior action." *Kelly*, 182 B.R. at 258. "Any reasonable doubt as to what was decided by a prior judgment should be resolved against allowing the collateral estoppel effect." *Id.*
>
> The preclusive effect of a state court judgment in a subsequent federal action is determined by the law of the state in which the judgment was entered. *See Gayden v. Nourbakhsh (In re Nourbakhsh)*, 67 F.3d 798, 800 (9th Cir.1995).

Plaintiffs cite *Baldwin* as indicating that a defendant who defaulted to a battery claim is collaterally estopped from discharging the debt under § 523(a)(6). They argue that all elements of

collateral estoppel are met in the instant case, because the special jury verdict found after trial that Houston committed an assault or battery on Wendell causing injury, and that the jury awarded total damages of $476,524.00.

Houston cites *Berr v. Fed. Deposit Ins. Corp. (In re Berr)*, 172 B.R. 299, 306 (9th Cir. BAP 1994) that any reasonable doubt should be resolved against giving a prior judgment collateral estoppel effect.  Houston argues that "intentional" was not described in Jury Instruction No. 17, and that "malice" was defined in Instruction No. 31 regarding punitive damages, but the jury declined to award punitive damages so there is reasonable doubt that the jury concluded that Houston subjectively intended to harm Wendell.

The state court jury verdict and judgment were awarded based on Plaintiffs' state law claims based on negligence and assault, not based on § 523(a)(6).  While some similarities may exist between a state law claim for assault and § 523(a)(6), both Montana law and federal law require more than similarities.  Montana law requires that the issue decided in the prior adjudication be identical with the one presented in the action in question.  *Swanson*, ¶ 16. Plaintiffs have failed their burden to show that Montana assault and battery is identical to a claim under § 523(a)(6).

The Ninth Circuit in *Barboza* reversed a summary judgment excepting a claim for "willful" copyright infringement from discharge under § 523(a)(6).  2008 WL 4307451 at * 4. Even though the term "willful" is used in copyright infringement cases, the Ninth Circuit stated that it is not equivalent to the term "willful" under § 523(a)(6) because in copyright infringement cases "willful" can be based on intentional or merely reckless behavior, and injuries resulting from recklessness are not sufficient to be considered willful injuries for exception for discharge

27

under § 523(a)(6).  *Barboza*, 2008 WL 4307451 at * 4-5, citing *Kawaauhau v. Geiger*, 523 U.S. 57, 60-61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).

The Ninth Circuit also reversed and remanded the case in *Barboza* because the courts below did not separately analyze the "malicious" prong of § 523(a)(6), and although some overlap may exist between the two prongs the Ninth Circuit requires a separate analysis for both the "willful" and "malicious" prongs.  *Barboza*, 2008 WL 4307451 at * 8; *Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1105 (9th Cir. 2005); *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1144 (9th Cir. 2002); *Transamerica Finance Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 554 (9th Cir. 1991) (per curiam); *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1209 (9th Cir. 2001).

Of course, no such separate analysis of "willful" and "malicious" are part of the record from the state court civil action admitted in this adversary proceeding, Ex. 1, 2, and 3, nor could that be expected.  Ex. 2, the jury verdict, and Ex. 17 do not discuss or decide the identical issues of "willful" and "malicious" which are pending in the instant case under § 523(a)(6).  Thus, the state court judgment and jury verdict fail to satisfy the requirement under Montana law for collateral estoppel, i.e., that the issues decided in the prior adjudication are identical with the ones presented in the action in question.  *Swanson*, ¶ 16.

Because Plaintiffs failed their burden to show that collateral estoppel should be applied to their judgments, this Court declines to apply the doctrine of collateral estoppel, and instead will comply with *Barboza*, *Sicroff*, *Jercich*, and *Su,* and analyze the willful and malicious prongs of § 523(a)(6) separately.

### III.  Willful.

An injury is willful under § 523(a)(6) if the debtor intends the consequences of his

actions. *Geiger*, 523 U.S. at 61, 118 S.Ct. 974; *Albarran*, 347 B.R. at 384. The Ninth Circuit wrote in *Su*, 290 F.3d at 1144: "The holding in *In re Jercich* is clear: § 523(a)(6) renders debt nondischargeable when there is either a subjective intent to harm, or a subjective belief that harm is substantially certain." Subjective belief includes actual knowledge that harm is substantially certain to result. *Su*, 290 F.3d at 1145-46; *Albarran*, 347 B.R. at 384.

Subjective intent may be gleaned from objective factors and circumstantial evidence which tends to establish what the debtor must have actually known when taking the injury-producing action. *Su*, 290 F.3d at 1146 n.6; *Albarran*, 347 B.R. at 384; *Jacks*, 266 B.R. at 742. Reckless disregard is insufficient to establish willfulness under § 523(a)(6). *Geiger*, 523 U.S. at 61, 118 S.Ct. 974; *Su*, 290 F.3d at 1145-46. The Ninth Circuit wrote in *Su*:

> That the Bankruptcy Code's legislative history makes it clear that Congress did not intend § 523(a)(6)'s willful injury requirement to be applied so as to render nondischargeable any debt incurred by reckless behavior, reinforces application of the subjective standard. The subjective standard correctly focuses on the debtor's state of mind and precludes application of § 523(a)(6)'s nondischargeability provision short of the debtor's actual knowledge that harm to the creditor was substantially certain.

*Su,* 290 F.3d at 1145-46.

Plaintiffs argue that Houston's testimony that he had no subjective motive to injury Wendell and did not believe that injury was substantially certain to result from his conduct, is contradicted by his own admission and other witness testimony. Houston argues that the burden of proof is on Plaintiffs and that they failed to prove that Houston subjectively intended to harm Wendell.

Plaintiffs contend that Linda and Steppe both testified about Houston's "look of rage" when he drove his tractor and struck the fence post, injuring Wendell, within an hour and a half

of being served with a civil summons to recover Plaintiffs' mules.  Plaintiffs contend that

Houston's denial of intent to injure Wendell is contradicted by Hood, a witness with no financial

interest in the outcome, who testified that Houston admitted to her that he tried to kill Wendell.

Plaintiffs contend that the physical evidence of the angle of Houston's tractor blade in the fence

post on Defendant's Ex. H, is inconsistent with and contradicts Houston's testimony regarding

the direction he was driving the tractor when it hit the post.

Houston argues that photographs, his Ex. C and D, show that the event could not have

occurred the way Plaintiffs claim.  He argues that his tractor's tire tracks on May 28, 2004, were

proceeding more or less parallel to the fence line, not directly at it as testified by Linda and

Eugenia, and that Robin's photograph, Ex. G, shows an absence of tracks which would have been

present on May 28, 2004, if the tractor had been traveling as testified by Linda and Eugenia.

Houston argues that Ex. A, B, C, E, F, and G show the large pile of timber and that it was

not physically possible for Wendell to be 2 or 3 feet from the post or to have been struck by the

post or the tractor.  Houston argues that the record is not completely clear where Wendell was

standing, and if he was not near the post the Court cannot infer that Houston subjectively

intended to injury Wendell when he struck the post.  Houston argues that Ex. E, F, O and 16

show that Linda's view from the dining room of Houston's property was obstructed by Plaintiffs'

garage.

Houston argues that Ex. H shows the crease in the post consistent with being struck by

the blade and only 2 strands of wire were broken by the impact, and that the post remained

anchored in the concrete footing which belies Linda's testimony that he approached the fence

directly at a high rate of speed rather than more or less parallel.  Ex. A, B and H, Houston argues,

30

show from the height of the point of impact that it was not possible to see the blade impact the post from the dining room because the log pile was in the way, and Houston argues that Linda and Steppe could not have seen him approach the fence parallel since Andersons' garage was in the way.

The witness testimony is contradictory on several points, necessitating a finding of witness credibility.  This Court closely observed the demeanor of the witnesses while testifying under oath, and cross examination, and having read Wendell's deposition admitted into evidence, the Court finds that Linda, Eugenia, and Hood are credible witnesses, but that Houston and Robin are not credible.  *Allen v. Iranon*, 283 F.3d 1070, 1078 n.8 (9th Cir. 2002); *Public Fin. Corp. v. Taylor (In re Taylor)*, 514 F.2d 1370, 1373-74 (9th Cir. 1975); *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); See also, *Casey v. Kasal* , 223 B.R. 879, 886 (E.D. Pa. 1998).  Houston's credibility is undermined by his own evidence, in particular Ex. A, B, F, G, and H.  Houston testified that he came along the fence at a slight angle almost parallel, as shown on Ex. C and D, but could not stop before his right front tire went into the ditch.  Ex. 2, pp. 3-4, states that Houston told the investigating officer, "just before he hit the fence the front right tire went into the irrigation ditch, causing the bucket on the tractor to dip down."  Ex. H in particular, and Ex. B, show that the impact could not have happened as Houston described, as a result of which Houston's story and credibility collapses and diminishes.

Ex. H, taken by Houston's attorney Dye which Houston testified has not changed since May 28, 2004, shows a completely intact post ring holding the wire strand, with the impact crease directly below it.  Ex. B also shows the crease directly below the post ring.  If Houston testified truthfully and told the investigating officer the truth, then the side of the bucket dropping

31

down on the post would have had to go through the post ring, and also through the wire, to reach the post where it left the impact crease.  However, both the post ring and the wire directly above the impact crease, show no structural damage whatsoever, which would have to be present if Houston's testimony and statement to the sheriff's investigator on Ex. 2, that he came in from the side and the bucket attached to a 6,000 lb. tractor dropped *down* on the post, was true.  The post ring above the impact crease looks the same as the ring below it on Ex. H, and the same as the rings above and below it on Ex. A and B.  Based on Houston's Ex. H, A, and B, the Court finds and concludes that Houston lied to the sheriff's investigator about how the bucket hit the post on Ex. 2, and lied under oath at trial.

The impact crease shown on Ex. B is consistent with the testimony of Linda and Eugenia that Houston came at Wendell on the tractor more or less straight on.  The slight angle of the impact crease is consistent with the front of the bucket blade slightly tilting, either when it was raised or due to uneven ground.  That would explain why the post ring just above the impact crease on Ex. H shows no damage, because the front of the bucket came into the post below the ring, as opposed to Houston's claim that the side of the bucket dropped down on the post.  In short, Plaintiffs' testimony version of the incident are consistent with Houston's Ex. H, A, and B. Houston's testimony is not consistent.

Other evidence undermining Houston's credibility are his Ex. C, D and F compared with his Ex. G, taken by his wife Robin.  Houston argues that Ex. G does not show tire tracks consistent with Linda's and Eugenia's testimony.  Robin testified that she took Ex. G after 8:00 p.m, after the sheriff's investigator Allestad met with Houstons on May 28, 2004, after the incident.  If that testimony is true, then none of the tire tracks and muddy field which Houston

32

testified are shown by Ex. C and D in support of his testimony that he came into the fence roughly parallel from the west, were present at the scene on May 28, 2004, after the incident. There is a significant amount of muddy upheaval in Houston's field, tire tracks, and dirt piled up shown on Ex. C and D which is not visible on Ex. G.  Therefore, if Robin's testimony regarding when she took Ex. G is true then the work shown by Houston's Ex. C, D, F, and Plaintiffs' Ex. 14, including Houston's tire tracks, all happened after Wendell was injured and the sheriff had interviewed Houstons.  Houston denied that he performed work on the ditch and put the tracks in on May 29, 2004, but his own Ex. G undercuts his credibility.  Plaintiffs' Ex. 14 shows that the tractor work near the ditch shown by Ex. F was continued east down the fence line towards the highway on May 29, 2004.

Turning to Houston's contentions regarding Wendell, Linda, Eugenia and Hood, the Court first finds the inconsistencies between Linda's and Eugenia's testimony are minor, and immaterial.  Given Houston's uncontested collision with the post and Wendell's injury, the Court deems it insignificant whether Linda, Jim or Eugenia yelled first when they saw Houston approaching Wendell.  The Court further cares not that Eugenia thought that Houston's tractor was red instead of green.  Lastly, the Court deems it immaterial that Eugenia and Linda differed about whether the friends Kim and Bev were at the house at the time of the incident, or arrived shortly after.

Houston argues that no proof exists in the record that Wendell was three feet from the fence post, and that he could not have been three feet from there because of the log pile.  But Houston told the sheriff's investigator that Houston "at that time was heading toward the area where Wendell was standing approximately three feet onto Wendells property."  Ex. 2, p. 3.

33

Houston also claimed on Ex. 2 that Wendell did not fall down, but the Court finds that Wendell did fall down based on the credible testimony of Linda, Eugenia, and Wendell which is consistent with their statements on the investigative report, Ex. 2. Houston's denial that Wendell fell is not credible.

Ex. K and L show the damaged post, and corroborate Linda's and Eugenia's testimony that they could see Houston approaching the fence post on the tractor. Ex. 16 and 17 show Andersons' equipment blocking the view, but the evidence shows that equipment was not present on May 28, 2004. Based on Linda's and Eugenia's eyewitness testimony that Houston drove the tractor at Wendell and struck the post, and the look of rage they saw on his face, and the circumstantial evidence of Houston's receipt of the summons and complaint shortly before, the Court finds and concludes that Houston intended to harm Wendell as a consequence of his actions. *Geiger*, 523 U.S. at 61, 118 S.Ct. 974; *Albarran* , 347 B.R. at 384; *Su*, 290 F.3d at 1144.

Linda's and Eugenia's testimony regarding Houston's look of rage and his intent to harm is corroborated by Hood's testimony that Houston intended to kill Wendell, which Hood memorialized in her note, Ex. 4. Hood's admitted friendship with Andersons does not undermine her testimony. It is not surprising that Andersons would have asked Hood to write Ex. 4 after learning about Houston's statement, since they were by then represented by counsel seeking legal redress. It does not aid Houston's contentions that Hood did not report his intention to law enforcement, because he was already under investigation and ultimately charged with two felonies. Finally, while unnecessary to satisfy their burden of proof, Houston's plea of nolo contendere is an admission under Montana law. *Safeco Inc. Co. of America v. Liss*, ¶ 49, quoting *Teitelbaum.*

34

The Court's conclusion that Houston intended to harm Wendell is supported by overwhelming credible evidence of Houston's subjective intent, circumstantial factors, and admissions.  In attempting to escape responsibility Houston altered the scene of the incident, and offered false testimony at trial.

### IV.  Malicious.

The "malicious" requirement is satisfied when plaintiff shows "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse."  *Jercich*, 238 F.3d at 1209.  In the Ninth Circuit conduct must be both willful and malicious for a debt to be excepted under § 523(a)(6), and specific findings must be made that the conduct was willful and malicious.  *Barboza*, 2008 WL 4307451 at *8.

Plaintiffs contend that Linda's and Eugenia's testimony that Houston drove his tractor at a high rate of speed and struck the fence post, and Houston's admission to Hood that he intended to kill Wendell, satisfy all 4 elements of the "malicious" requirement.  Houston responds that "not a word" of the testimony survives comparison with the photographic evidence of the damaged pole still in its hole.

The footing of the damaged post is visible on Houston's Ex. B and E.  The footing of the next post directly to the east is not visible above ground on Ex. B, while the footing on the first post on the other side is visible.  The Court finds it credible that the footing of the damaged post was moved by the collision with the tractor bucket, although probably not uprooted completely. That fact, however, is another minor matter which the Court does not deem material given the other compelling evidence of Wendell's injury and Houston's conduct.

Plaintiffs argue that the minor inconsistencies in Linda's testimony about the 911 call,

and Eugenia's testimony about the color of the tractor and arrival time of other persons, are minor and that the essential facts are established by their testimony, Houston's admission to Hood, and Ex. H.  The Court agrees.

Houston attacks Linda's credibility, contending there is "obvious malice and hatred toward the Houston family" shown by Linda's reluctance to dismiss Robin from the civil suit. However, Robin was not named in the judgment and special verdict form, Ex. 1 and 2, in the state court civil suit.  Given the circumstances Linda's animosity is understandable, and does not undermine her credibility in any degree comparable to what Houston did to his own credibility.

Houston suggests that during the 30 seconds Linda testified she watched Houston drive the tractor toward Wendell "she did not bother to warn her husband" rather than calling 911 before the impact.  The Court notes here that both Linda and Wendell are elderly.  Linda testified that Wendell was hard of hearing, and no evidence exists to the contrary.  He would not have heard her shout a warning, she was too far away to reach him, and anyway Wendell was aware that Houston was coming at him on the tractor according to his deposition, Ex. Q.  The Court will not second guess Linda's decision to call 911 instead of trying to reach Wendell.

Houston argues that Ex. 15 shows that it would not be possible for Linda and Eugenia to see the "hate in his eyes" as he bore down on Wendell because they were 90 feet away from the dining room window, and that he approached the fence more or less parallel and they could not have seen because Andersons' garage was in the way.  Houston's testimony and version of events has already been proven false based on his Ex. H and other evidence, as discussed above.  The Court deems Linda's and Eugenia's testimony regarding the look on Houston's face as credible, and probative of Houston's maliciousness.

36

Houston attacks Linda's credibility because she denied that any bad blood existed between them, and instead only minor problems existed, citing Ex. 16 and 17 and the civil action in justice court which Andersons filed against Houston when he impounded Andersons' mules and would not return them. However, Houston himself corroborated Linda's testimony at trial, where he testified several times that their disputes were minor, that he was not upset over being served with the complaint, and indeed he expected it.

Houston asserts that there is "manufactured evidence", wherein Linda admitted that she did not complain to authorities about what she testified was Houston's obstruction of justice by digging a ditch the morning after the incident next to the property line and obliterating Houston's tire tracks, as shown by Ex. C, D, E, and F. Houston asks why Linda did not tell deputies who came to photograph Houston's field the day after the incident that the scene was changed by Houston. Linda had called 911 the day before, and spoke with the sheriff's investigator as reflected on Ex. 8. Houston was later charged with two felonies. In the Court's view Houston's own Ex. G and Robin's testimony when compared with Ex. C, D and F, show that it is Houston, not Linda, who manufactured evidence.

Houston quotes Wendell's deposition testimony: "I don't know if he was trying to hurt me or he just hit the fence, but he knocked me down." First, this contention contradicts Houston's statement to the sheriff's investigator on Ex. 2, p. 4, "that Wendell never fell." Second, since Linda, Wendell and Houston all testified that their disputes were minor before Houston assaulted Wendell with the tractor, Wendell had no reason to think that Houston would try to hurt him.

Houston attacks Eugenia's credibility as Plaintiffs' friend and contends that "other thinks

37

[sic]" she said cannot be true because of the photographic evidence.  Houston argues that the

photos show the tire tracks parallel to the fence rather than straight on, that the tractor could not

have been going 20 mph because of the minor damage to the fence post, and that Wendell could

not have been only 2 or 3 feet from the fence because that was where the timber pile was and he

would have had to be standing on the timber pile.  Houston's version of the incident has been

rejected above as false, and his tire tracks on Ex. C and D were added after the incident based

upon his wife's testimony and Ex. G.  Houston told the sheriff on Ex. 8, p. 3, that Wendell was 3

feet from the fence.  The Court does not find that Eugenia's friendship with Andersons in any

way undermined her credibility regarding the material facts.

Houston attacks Hood's credibility as a good friend of the Plaintiffs, and that she became

aware of the incident from Linda and wrote her statement at Ex. 4 at Linda's suggestion.

Houston's brief states on page 9:  "She admitted that she did give[36] a copy of the statement nor

discuss the June 11 incident with the sheriff or county attorney even though she knew that the

Andersons had preferred criminal charges . . . ."  Houston attacks Hood's testimony that "she

thought that Bill was serious," because as a quasi-law enforcement officer Houston asks why

Hood did not report the conversation to law enforcement if she thought he was serious.  Hood

gave Ex. 4 to the Andersons, and given that Houston was under investigation and ultimately

charged with two felonies the Court does consider Hood credible.

Houston argues that he did not intend to harm Wendell, and that his testimony is credible

and consistent with his statement to the sheriff on May 28, 2004, and consistent with the

---

[36]The Court presumes that Dye meant to say that Hood admitted that "she did not give" a
copy" of Ex. 4 to the sheriff or county attorney, which is what Hood testified.

photographic evidence and does not suggest manufactured evidence, unlike Linda. Houston contends that his credibility outweighs that of the Plaintiffs' witnesses. The Court disagrees for reasons stated above.

Plaintiffs' burden to prove maliciousness is to show "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *Jercich*, 238 F.3d at 1209. The Court finds that Wendell has satisfied his burden by a preponderance of the evidence.

The Court finds that Houston's act in driving his tractor into the fence post with Wendell three feet away was a wrongful act, as shown by the testimony of Linda and Eugenia, Hood, and Ex. 1 and 2 entered in the state court, and Ex. 8. The testimony of Eugenia, Linda, and Hood that Houston drove the tractor toward Wendell and struck the fence in a rage intending to kill him shows and the Court finds that it was done intentionally, which is corroborated by Ex. 8.

Houston's conduct driving the tractor into the fence post with Wendell three feet away necessarily caused Wendell's injury, as shown by Ex. 11, 12, 2, 8, and Q, and the testimony of Linda and Eugenia. Finally, the Court finds that Houston's act was done without just cause or excuse. *Jercich*, 238 F.3d at 1209. His testimony that it was an accident is not credible, and any other explanation for ramming the fence post next to Wendell is not just cause or excuse. All the elements to show that Houston's act was malicious under § 523(a)(6) have been established by a preponderance of the evidence. Accordingly, Judgment shall be entered against Houston in favor of Wendell for his portion of the civil judgment, Ex. 1.

## V. Linda's Derivative Claim.

Plaintiffs contend that the $100,000 portion of the judgment awarded to Linda by the

39

special jury verdict included emotional distress suffered by Linda and loss or impairment of her marriage relations with Wendell.  They argue that Linda's claims for emotional distress and impairment of marital relations are derivative under Montana law from an injury to a family member, citing *Allstate Insurance Company v. Wagner-Ellsworth*, 2008 MT 240, 344 Mont. 445, 188 P.3d 1042 and therefore not subject to discharge and within the scope of § 523(a)(6) since the entire judgment arises from Houston's willful and malicious injury to Wendell.

Houston contends that no allegation or evidence[37] exists in the record of intent by Houston vis-a-vis Linda to support exception from his discharge of her $100,000 claim under § 523(a)(6).  He argues that the special jury verdict found that Houston was negligent and caused "injury or damages to either Plaintiff", and that no evidence exists that he acted willfully or maliciously toward Linda because she was 90 feet away from the fence line in her dining room and Houston could not see her, and negligence or recklessness is not willful under § 523(a)(6).

In *Wagner-Ellsworth* the issue was whether emotional injuries were included in an insurance policy definition of "bodily injury."  The Montana Supreme Court construed specific provisions in the insurance policy and held that claims for damages sustained by anyone else as a result of bodily injury sustained by any person were covered under the policy language[38].

---

[37]Houston's brief at page 2 states that "there was one shred of evidence" that Houston acted willfully or maliciously.  This is clearly a typographical error, not an admission.  Houston meant to say there was "not one shred of evidence" or "no shred of evidence".

[38]The court, however, applied the monetary policy limits to the third parties' derivative claims under the policy language and MONT. CODE ANN. § 6-6-103(2)(b).  *Wagner-Ellsworth*, ¶¶ 21, 22, 24.  It is also worth noting in *Wagner-Ellsworth*, ¶ 40, that the Montana Supreme Court departed from its prior holding and joined other courts holding that the term "bodily injury" in an insurance policy includes mental or psychological injury that is accompanied by physical manifestations, but continues not to include purely emotional injuries.  (Citing cases).

*Wagner-Ellsworth,* 2008 MT 240, ¶¶ 18, 19.  *Wagner-Ellsworth* does not support Linda's

position because that case construed language of an insurance policy, which the instant case does

not involve.

The instant adversary proceeding is based rather on § 523(a)(6).  The Court's own

research has not disclosed any case law supporting Linda's contention that her claim should be

excepted as a derivative claim of Wendell's.  On the contrary, failure to make the separate

analysis of both the willful and malicious prongs under § 523(a)(6) with respect to Linda's

injuries would likely constitute reversible error in the Ninth Circuit.  *Barboza*, 2008 WL 4307451

at * 8; *Sicroff*, 401 F.3d at 1105*; Su*, 290 F.3d at 1144.

Thus, Linda has the burden of proof under § 523(a)(6) to except from Houston's

discharge her derivative claim for emotional distress and impairment of marital relations under

both prongs.  The Court finds that Linda has failed to satisfy her burden under both the "willful"

and "malicious" prongs.

No evidence exists in the record that Houston intended the consequences to Linda of his

actions directed at Wendell, either by a subjective intent to harm Linda or a subjective belief that

harm to Linda was substantially certain.  *Geiger*, 523 U.S. at 61, 118 S.Ct. 974; *Albarran*, 347

B.R. at 384; *Su*, 290 F.3d at 1144.  Linda was in the house, and no evidence exists in the record

that Houston was aware of Linda's presence or that he intended to cause Linda harm.

Likewise, Linda failed her burden to prove the "malicious" prong of § 523(a)(6) that

Houston's act was done intentionally to harm Linda, because no evidence exists in the record that

Houston knew she was there.  Since Linda failed her burden of proof under both prongs of §

523(a)(6), her portion of Andersons' joint claim is not excepted from discharge.

41

## CONCLUSIONS OF LAW

1.  This Court has jurisdiction of this cause under 28 U.S.C. § 1334.

2.  This is a core proceeding involving Plaintiffs' claims for exception from Defendant's discharge of their debts under 28 U.S.C. § 157(b)(2)(I) and 11 U.S.C. §§ 523(a)(6), which is strictly construed against an objecting creditor and in favor of the debtor. *Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992).

3.  The Plaintiff Linda Anderson, and witnesses Eugenia Steppe and Jody Hood, are credible witnesses.  Defendant/Debtor William C. Houston and Robin Houston are not credible witnesses.

4.  The Plaintiffs' civil judgment from state district court is not entitled to collateral estoppel effect or issue preclusion in this adversary proceeding because the issues decided in that case were not identical to the issues under 11 U.S.C. § 523(a)(6).

5.  The Plaintiff Wendell H. Anderson satisfied his burden of proof by a preponderance of the evidence with respect to his claim for exception from Defendant's discharge of his claim in the amount of $375,524.00 under § 523(a)(6) for willful and malicious injury to Wendell.

6.  The Plaintiff Linda Anderson failed to satisfy her burden of proof by a preponderance of the evidence with respect to her claim for exception from Defendant's discharge of her claim in the amount of $100,000.00 under § 523(a)(6) for willful and malicious injury to Linda.

**IT IS ORDERED** a separate Judgment against the Defendant William C. Houston shall be entered in conformity with the above in favor of the Plaintiff Wendell H. Anderson excepting Wendell's claim in the amount of $375,524.00, plus accrued interest and costs, based upon the judgment entered on or about May 31, 2007, in the Montana Twenty-First Judicial District Court,

Ravalli County, Cause No. DV-06-40, from the Defendant's discharge under 11 U.S.C. §

523(a)(6); but Linda Anderson's derivative claim against Defendant based on § 523(a)(6) is

dischargeable and discharged.

                              BY THE COURT

                              HON. RALPH B. KIRSCHER
                              U.S. Bankruptcy Judge
                              United States Bankruptcy Court
                              District of Montana

43